UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

CASSANDRA DEAVERS,

                                             Plaintiff,

v.

RAPPAHANNOCK REGIONAL JAIL
AUTHORITY, *et al.*,

                                             Defendants.

Action No. 3:13-CV-821

### MEMORANDUM OPINION

THIS MATTER is before the Court on a Motion to Dismiss ("RRJA Motion") (ECF No. 12) filed by Defendants Rappahannock Regional Jail Authority ("RRJA"), Joseph Higgs ("Higgs"), and Licensed Practical Nurses K. Diggins ("Diggins") and S. Canzon, as well as a Motion to Dismiss ("Dalberg Motion") (ECF No. 17) filed by Defendant Richard K. Dalberg ("Dr. Dalberg"). The three-count Complaint alleges constitutional violations pursuant to 42 U.S.C. § 1983 and common law negligence.

## I.   BACKGROUND[1]

### A.   FACTUAL BACKGROUND

Cassandra Deavers was forty-eight years old on December 8, 2011, when she was sentenced to serve thirty days' incarceration in the Rappahannock Regional Jail ("Jail") for her conviction of Driving Under the Influence, second offense. At the time, Deavers was under the treatment of a physician for a prior pulmonary embolism and had been prescribed a daily dose of the blood thinner warfarin.[2] On December 1, 2011, seven days prior to her sentencing, Deavers's

---

[1] For the purposes of this memorandum, the Court assumes all of Deavers's well-pleaded allegations to be true and views all facts in the light most favorable to her. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

[2] Warfarin is the generic name for the brand-name drug Coumadin. The Complaint and the documents attached thereto use warfarin and Coumadin interchangeably. For the sake of ease, the Court refers to the drug throughout this

primary care physician increased her dosage of warfarin to twelve milligrams per day and had ordered that her International Normalized Ratio and Prothrombin Time ("INR/PT") levels be checked on a weekly basis. An individual's INR/PT levels are indications of the time required for a patient's blood to clot and, therefore, are important indicators of whether the patient's warfarin dose is too high, putting her at risk for internal bleeding, or too low, putting her at risk for embolism.

After being sentenced on December 8, 2011, Deavers was transferred to the Jail to begin her incarceration. Deavers's personal property was inventoried, and the Jail medical staff performed a physical examination of Deavers. During these procedures, Deavers informed RRJA medical staff that she was prescribed warfarin, which was to be taken daily, and that her INR/PT levels were to be checked weekly. The RRJA medical staff also noted that Deavers was allergic to aspirin, but failed to refer her to a physician or to order an INR/PT test.

After her initial intake at the Jail, Deavers was placed in solitary confinement because of an assessed suicide risk. Deavers remained in solitary confinement until December 12, 2011, during which time she did not have access to a toilet or sink with which to clean herself. Two days after her incarceration, an unidentified nurse took Deavers's blood for an INR/PT test, but the results were never returned to Deavers despite multiple requests over the following thirty days. The results of this first test showed that Deavers's INR/PT levels were too high, putting her at risk for uncontrolled bleeding and indicating that her dose of warfarin should have been decreased.[3] The Complaint alleges that the Jail, its medical staff, and Dr. Dalberg "failed to check on the test results, and failed to take the necessary therapeutic steps to correct" Deavers's out-of-range INR/PT levels. (Compl. ¶ 31.)

---

Memorandum Opinion by its generic name, warfarin.

[3]  The Complaint alleges that "normal" INR levels range from 0.8 to 1.2, but that Deavers's INR level was 1.8; and that normal PT levels range from 9.1 and 12.0, but that Deavers's PT level was 19.5

A Physician Orders sheet signed by an unidentified nurse indicates that on December 12, 2011, an unidentified physician ordered Deavers's INR/PT levels to be checked again in two weeks. That same day, Deavers was released into general population. She was assigned to a cell that was filthy and provided neither toilet nor sink facilities. Deavers requested the results of her first INR/PT test, but was given no information.

On December 21, 2011, Deavers completed a medical request form ("First Medical Request") complaining of a headache lasting for the previous three days. Such medical request forms were submitted by inmates to Jail medical staff in order to request medical evaluation and, when needed, treatment. Deavers alleges that the Jail medical staff responding to medical request forms have discretion to grant or deny a higher level of care. In her First Medical Request, Deavers indicated that medical request forms had not been available for the prior three days. The following day, on December 22, 2011, Deavers had a medical examination at which Defendant John Doe 1 or Defendant Nasmh diagnosed her with Methicillin-resistant Staphylococcus aureus ("MRSA") based on the presence of a hard, red bump that had appeared on her buttock two days prior. Deavers was prescribed an antibiotic for the infection and Tylenol for her headache. The treating Defendant did not check or note the results of Deavers's first INR/PT test and did not note that severe headaches are a symptom of warfarin toxicity.

On December 31, 2011, Deavers had her blood drawn by Defendant Diggins for a second INR/PT test. Deavers asked Diggins what the results of her first test were and Diggins responded, "No news is good news." That same day, Deavers completed another medical request form ("Second Medical Request"). The Second Medical Request indicated that Deavers had bruising on the backs of both legs and was experiencing significant pain as a result.

On January 2, 2012, Deavers completed yet another medical request form ("Third Medical Request") complaining of a stomach ache lasting for two days and irregular bowel movements since her incarceration began. That same day, Deavers was given a physical exam by

Diggins, possibly in response to both the Second Medical Request and the Third Medical Request.[4] Despite knowing that Deavers was taking warfarin, Diggins took no action beyond prescribing Deavers Tylenol for her pain complaints. Diggins did not check the results of either of Deavers's INR/PT tests and did not refer Deavers for additional care.

On January 4, 2012, Deavers blood was redrawn for an INR/PT test. At 9:00 p.m. that evening, Deavers began bleeding profusely from the needle site. Between 11:00 p.m. and 1:00 a.m. the following morning, Deavers's cellmate twice hit the attention button, seeking medical care for Deavers's loss of blood. The guards who responded, Defendants John Doe 5 and John Doe 6, told Deavers that she could not be seen without first completing a medical request form. At approximately 3:00 a.m., a different guard, Defendant John Doe 7, came to Deavers's cell and, at her request, agreed to inform the Jail's medical staff about Deavers's continued bleeding. However, John Doe 7 either failed to inform them, or they declined to respond. Finally, at 5:00 a.m., when the cell doors were unlocked, Deavers attempted to leave, but immediately lost consciousness, fell, and hit her head, causing a one-centimeter laceration on the back of her head.

Deavers was transported to Mary Washington Hospital, where she was diagnosed with a large retroperitoneal hematoma "most likely secondary to Comadin [sic] toxicity," acute blood loss, anemia, and dehydration secondary to blood loss. Deavers remained in the hospital for five days, receiving multiple blood transfusions and placement of an inferior vena cava filter. Deavers was released back to the Jail on January 12, 2012, and was released from the Jail on January 15, 2012.

//

---

[4] On January 4, 2014, an unidentified member of the Jail medical staff documented on the Second Medical Request that Deavers had been seen on January 2, 2014. There is no indication of whether the Second Medical Request was available during Diggins's examination of Deavers on January 2, or whether Deavers complained to Diggins of her leg bruising. Nevertheless, it is reasonable to infer that Diggins would have discovered Deavers's bruised legs during a physical examination that revealed the presence of an infection on Deavers's buttock.

B. PROCEDURAL BACKGROUND

On December 10, 2013, Deavers filed suit against the Defendants named above, as well as Jail LPN Nasmh, the Fredericksburg Emergency Medical Alliance, Incorporated ("FEMA"), three Jane Doe Defendants and eight John Doe Defendants. Notably, Defendant Nasmh has not appeared in the case, and FEMA has not joined either motion to dismiss. Count One of the Complaint—which relates generally to the Jail conditions and specifically to the events of January 4, 2011—raises a claim pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging a supervisory liability claim against Higgs—who is the Superintendent of the Jail—and a deliberate indifference claim against all other defendants. Count Two of the Complaint raises a Section 1983 claim against the nursing staff of the Jail, alleging that they were deliberately indifferent to Deavers's serious medical condition by failing to monitor her INR/PT test results or to identify the symptoms of warfarin toxicity. Count Three of the Complaint raises a common law negligence claim against Dr. Dalberg and FEMA for Dr. Dalberg's treatment of Deavers.

The RRJA Motion was filed on April 7, 2014, and the Dalberg Motion was filed on April 17, 2014. Notably, in her opposition to the RRJA Motion, Deavers indicates that she "is voluntarily withdrawing her claim against Defendant S. Canzon, LPN, with prejudice." (Mem. Opp'n RRJA Mot. 11.) The motions are ripe and a hearing was held on Monday, June 16, 2014.

## II.   LEGAL STANDARD

Rule 12 of the Federal Rules of Civil Procedure allows a defendant to raise a number of defenses to a complaint at the pleading stage, including failure to state a claim. A motion to dismiss for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a claim, rather than the facts supporting it. Fed. R. Civ. P. 12(b)(6); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A court ruling on a Rule 12(b)(6) motion must accept all of the factual allegations in the complaint as true, *see Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th

Cir. 1999); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254-55 (W.D. Va. 2001), in addition to any provable facts consistent with those allegations, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and must view these facts in the light most favorable to the plaintiff, *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 & n.3. The Court need not accept legal conclusions that are presented as factual allegations, *id.* at 555, or "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996). Qualified immunity is such an affirmative defense because, if applicable, qualified immunity includes "an entitlement not to stand trial or face the other burdens of litigation." *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc).

### III.    DISCUSSION

#### A.  RRJA MOTION

For the reasons that follow, the Court will GRANT IN PART the RRJA Motion as it relates to Higgs and RRJA, and DENY IN PART the RRJA Motion as it relates to Diggins. Consistent

with the requests of Deavers and the RRJA Motion, the Court will grant Deavers leave to file an amended complaint as it pertains to Higgs and RRJA.

       1.  <u>Defendants Higgs and RRJA</u>

Read in light of the explanation and arguments presented by Deavers in opposition to the RRJA Motion, the Complaint attempts to state two distinct bases for the supervisory liability of Higgs and RRJA. First, Deavers argues that Higgs implemented a series of policies that lead to conditions in the Jail so likely to result in the Jail medical staff's deliberate indifference that it amounted to tacit authorization of such conduct. (*See* Pl.'s Mem. Opp'n RRJA Mot. 6.) Second, Deavers argues that Higgs implemented a policy requiring inmates to complete a medical request form prior to any medical treatment being provided. In *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), the Fourth Circuit set forth three elements that must be established to impose supervisory liability under Section 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

13 F.3d at 799 (internal quotation marks omitted). Under this standard, both of Deavers's claims against Higgs and RRJA fail the requirements for sufficiently pleading a claim for supervisory liability under Section 1983.

As to the first alleged basis for supervisory liability, Deavers points to conditions in the Jail that were necessarily implemented with the knowledge of Higgs, who is the policymaker for the Jail and who is responsible for controlling the staffing levels, hiring decisions, and population levels at the Jail. These conditions included inmate overcrowding, understaffing, meager training of medical staff, lack of sanitary facilities, and most importantly, "relegating Plaintiff's medical care to Licensed Practical Nurses who lacked the capability to make a proper differential

diagnosis of her symptoms." (Pl.'s Mem. Opp'n RRJA Mot. 6.) Deavers essentially argues that the policy of delegating inmates' medical care to LPNs who "had complete discretion to grant or deny referral for higher levels of care" posed a pervasive and unreasonable risk of constitutional injury to all inmates.

The Court rejects this argument. Even assuming that LPNs functioned at the Jail unsupervised and with complete discretion, Deavers seems to rest her argument on a belief that LPNs are generally incompetent to function in the role allegedly assigned to them at the Jail. In other words, Deavers suggests *any care* from an LPN—rather than *inadequate care* from an LPN—posed a pervasive and unreasonable risk of constitutional injury. However, there is simply no factual allegation or citation of authority in the record that supports such a broad holding.[5]

The Complaint is similarly deficient when limited to an allegation that Higgs tacitly authorized inadequate medical care by LPNs at the Jail. In order to meet the first requirement for supervisory liability under *Shaw*, the supervisor must have knowledge that a subordinate's conduct posed a pervasive and unreasonable risk of constitutional injury. *Shaw*, 13 F.3d at 799. "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions . . . ." *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373-74 (4th Cir. 1984)). The Complaint alleges only one occasion on which an inmate was given inadequate medical care, and Deavers "cannot satisfy [her] burden of proof by pointing to a single incident or isolated incidents." *Slakan*, 737 F.2d at 373 (citing *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)). Accordingly, because the Complaint lacks factual allegations supporting a claim that inadequate medical care was widespread at the Jail, Deavers's claim for supervisory liability based on conditions at the Jail fails as a matter of law.

---

[5] While inadequate training can constitute an independent basis for liability under Section 1983, that training must be so inadequate as to amount to a policy of deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Deavers has not successfully raised a failure-to-train claim for the same reasons that her other supervisory liability claims fail. There simply are insufficient factual allegations of a pattern of constitutional deprivation to plausibly support the inference that Higgs and RRJA had knowledge that Jail LPNs—licensed medical care providers—came to their positions with medical expertise insufficient to competently perform their assigned duties.

As to the second alleged basis for supervisory liability, the Complaint suffers from the same defect as the first. Deavers alleges that Higgs implemented a policy of denying medical care unless and until a medical request form was completed. However, the Complaint identifies only a single occasion on which an inmate was denied medical care for this reason: the unnamed defendant guards' denial of care to Deavers on January 4, 2012. As previously explained, allegations of isolated conduct are insufficient to plausibly allege that a supervisor had knowledge of conduct creating a pervasive and unreasonable risk of constitutional injury. *Shaw*, 13 F.3d at 799. Because the Complaint does not plausibly allege that the medical request form policy resulted in "widespread abuses," Deavers's claim for supervisory liability fails as a matter law.[6]  *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373).

Because the Court finds that Deavers's claims against Higgs and RRJA fail as a matter of law, the Court does not reach Higgs's claim for qualified immunity. Additionally, Deavers has informally requested leave to amend her pleadings in the event that the Court finds them insufficient. Under Rule 15(a)(2), a party may amend its pleading with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). Because Defendants Higgs and RRJA have consented in writing, and in light of the fact that these claims fail for factual sufficiency, Deavers may amend her Complaint as to Higgs and RRJA.

    2.  <u>Defendant Diggins</u>

With respect to Deavers's allegations against Diggins, the Complaint is sufficient as a matter of law. A jail official's deliberate indifference to the substantial risk of serious harm to an

---

[6] Deavers may have plausibly alleged that the Jail maintained a policy that required inmates to fill out a medical request form. However, this allegation alone is insufficient to establish a pervasive and unreasonable risk of injury. Absent a plausible allegation that medical care would be refused unless and until a medical request form was completed, there is no causal link between the use of medical request forms and Deavers's injury. *See Slakan*, 747 F.2d at 376 (quoting *Wellington*, 717 F.2d at 936) (explaining that the affirmative causal link may be proved directly or by showing that the injury was a natural and probable consequence of the defendant's conduct). And the Complaint fails to plausibly allege any facts supporting the inference that Higgs implemented or had knowledge of a policy that would uniformly deny medical care unless and until a medical requests form was completed. *See Twombly*, 550 U.S. at 555 & n.3.

inmate violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted). To successfully allege a claim of deliberate indifference to a serious medical need, a plaintiff must satisfy a two-pronged test consisting of an objective element and a subjective element. *See Farmer*, 511 U.S. at 834, 837. First, the plaintiff must allege that the inmate had an "objectively, sufficiently serious" medical condition. *Id.* at 834. Second, she must allege that the prison official actually knew of and disregarded an excessive risk of harm related to the inmate's serious medical condition. *Id.* at 837 (rejecting the invitation to adopt an objective test for deliberate indifference). "Actual knowledge or awareness on the part of the [prison official] is essential to proof of deliberate indifference." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995).

Deavers arguably asserts two separate claims for deliberate indifference against Diggins.[7] First, the Complaint alleges that Diggins and the unnamed medical staff defendants (collectively, "Nurse Defendants") failed to appropriately monitor Deavers's INR/PT levels and failed to check the results of INR/PT tests that were actually performed. Second, the Complaint appears to allege that the Nurse Defendants were deliberately indifferent for failing to diagnose warfarin toxicity or to refer Deavers for higher levels of medical care. The first of these claims is sufficient to survive a motion to dismiss; the second fails the deliberate indifference standard as a matter of law.

Whether a complaint makes plausible allegations is a "context-specific task in which the factual allegations of the complaint must be examined to assess whether they are sufficient to raise a right to relief above the speculative level." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Twombly*, 550 U.S. at 555)) (internal quotation marks and citations omitted). While a complaint need not forecast evidence

---

[7] It is somewhat unclear whether the allegations related to Diggins's failure to diagnose warfarin toxicity are intended as a stand-alone claim of Diggins's deliberate indifference, or if they are intended to bolster the claim against Higgs for supervisory liability. The Court has liberally construed the Complaint for the sake of completeness and treats the warfarin toxicity claims as a stand-alone claim.

or prove the elements of a claim, it must "allege sufficient facts to establish those elements." *Id.* (quoting *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 288, (4th Cir. 2012)). Deavers has plausibly alleged that as a survivor of a pulmonary embolism, she had a serious medical condition that required treatment with warfarin, including regular monitoring of INR/PT levels to ensure that such treatment would effectively thin Deavers's blood without causing hemorrhaging. She has also plausible alleged that the Nurse Defendants had actual knowledge of this serious medical condition. Therefore, the success of Deavers's claims against the Nurse Defendants turns on whether they had actual knowledge that their failure to take certain actions would create an excessive risk of harm to Deavers.

As to the allegation that the Nurse Defendants failed to appropriately monitor Deavers's INR/PT results, the Complaint sufficiently states a cause of action. Two questions are before the Court: (1) whether the Nurse Defendants had actual knowledge that their failure to monitor Deavers's INR/PT levels would cause a serious risk of harm; and (2) whether the Nurse Defendants—despite their knowledge—actually failed to monitor Deavers's INR/PT levels. Regarding the first question, the Complaint alleges that the Jail medical staff documented Deavers's need for regular monitoring, that a Jail physician ordered regular monitoring, and that the need for regular monitoring and the consequences of failing to monitor are commonly known to medical professionals. Under these facts, Deavers has plausibly alleged that the Nurse Defendants had the requisite actual knowledge.

Regarding the second question, the Complaint alleges that the Nurse Defendants failed to draw Deavers's second blood sample within two weeks as ordered by the Jail physician; her blood was drawn five days late, on December 31, 2012. Additionally, the Complaint twice alleges that no Jail employee checked the results of her INR/PT tests prior to January 4, 2012, (Compl. ¶¶ 31, 42), and supports this allegation by asserting that numerous requests to obtain the results of her INR/PT tests were ignored or denied. To be clear, the Nurse Defendants' failure to provide

the results of the INR/PT tests to Deavers does not constitute deliberate indifference, but their consistent denial of Deavers's requests supports the inference that there were no test results to share. Supported by such facts, a reasonable inference may be drawn that the results of Deavers's INR/PT tests were not, in fact, reviewed by any Jail employee.

Based on the foregoing factual allegations, Deavers has plausibly alleged that the Nurse Defendants failed to monitor Deavers's INR/PT levels in disregard of a known risk that failure to monitor would create a substantial risk of serious injury to her. Diggins's assertions to the contrary are unpersuasive. Diggins asserts that she was not responsible for taking any actions inconsistent with, or in addition to, those ordered by Jail physicians. This assertion, however, is unsupported by any evidence of the actual policies or delegation of duties in place at the Jail. Further, Diggins ignores the fact that her conduct was inconsistent with the Jail physicians' orders for failing to timely draw Deavers's second blood sample.

As to the allegation that the Nurse Defendants failed to diagnose Deavers's warfarin toxicity, the Complaint fails to state a claim for deliberate indifference. The Complaint alleges that Deavers reported classic symptoms of warfarin toxicity to the Nurse Defendants, but does not allege that the Nurse Defendants ever realized the import of Deavers's symptoms. Such an allegation is inherently inconsistent with an allegation of deliberate indifference, which requires that a defendant: (1) know facts indicating that a substantial risk to the inmate existed; (2) conclude that the inmate was at risk; and (3) fail to make efforts to mitigate that risk. *Farmer*, 511 U.S. at 837. Under this standard, the Complaint's allegation that Deavers's symptoms "should have alerted" the Nurse Defendants to her plight does not state a claim of deliberate indifference—it defeats a claim of deliberate indifference.[8] (Compl. ¶ 38.) Because of Deavers's

---

[8] Deavers is incorrect to suggest that constructive knowledge is sufficient to impose liability for deliberate indifference or to necessarily create a jury triable issue. The Supreme Court has noted that subjective knowledge is a fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. However, this standard of proof does not indicate that liability for deliberate indifference may be imposed when a prison official lacks actual knowledge of a substantial risk to an inmate. The Complaint plainly fails to allege

consistent use of the language of constructive knowledge, the Court cannot read the Complaint as alleging that the Nurse Defendants ever concluded that Deavers was suffering from warfarin toxicity. Therefore, Deavers's claim based on the Nurse Defendants' failure to diagnose Deavers's warfarin toxicity fails as a matter of law.

The Court finds that Diggins's claim for qualified immunity fails on the current record. Diggins's argument—in its entirety—consists of a single paragraph with citation to a case that does not discuss or base its holding on qualified immunity. She argues that she conformed her conduct to the Jail physicians' orders and "[n]othing in the governing law at the time suggested that she had to do more." (Mem. Supp. RRJA Mot. 12.) However, at the time of Deavers's injuries, clearly established law required that Diggins not be deliberately indifferent to Deavers's serious medical needs and, as explained above, the Complaint alleges such conduct. Diggins has offered no evidence to the contrary, and therefore, she has not met her burden to show that a grant of qualified immunity is appropriate.

B. DALBERG MOTION

For the reasons that follow, the Court will DENY the Dalberg Motion. Dalberg makes two primary arguments in support of the Dalberg Motion. First, he asserts that both the Section 1983 claim and the negligence claim fail to state facts sufficient to plausibly allege claims against Dalberg.[9] Second, even if the Court finds that the Complaint is sufficient, Dalberg asserts that he is entitled either to state sovereign immunity or to qualified immunity.

1. Factual Sufficiency of the Complaint

In total, the Complaint names Dalberg in five paragraphs:

---

that any Nurse Defendant had actual knowledge that Deavers was suffering from warfarin toxicity and deliberately chose not to refer her for higher levels of medical care.

[9] The Court construes the Complaint as alleging both a Section 1983 claim and a negligence claim against Dalberg. Such a construction is appropriate in order to avoid subordinating function to form and because Dalberg has demonstrated that he is on notice of both claims.

1. "At all relevant times, Defendant employed Defendant, Dr. Rickard K. Dalberg, and contracted out his services to RRJ for the purposes of providing adequate, humane, and necessary medical care to inmates, and Plaintiff, at RRJ." (Compl. ¶ 10.)

2. "Defendant, Rickard K. Dalberg, M.D., was at all relevant times a medical doctor licensed in the Commonwealth of Virginia Dr. Dalberg was employed directly with Defendant FEMA, and upon information and belief, was under contract with RRJ to provide adequate, humane, and necessary medical care to inmates, and Plaintiff, at RRJ. Dr. Dalberg is being sued in his official and individual capacities. He is an M.D. required to know and follow the standard of care for a physician in Virginia." (Compl. ¶ 11.)

3. "However, RRJ, its medical staff, and Dr. Dalberg failed to check on the test results, and failed to take the necessary therapeutic steps to correct this dangerous, indeed potentially lethal and correctible condition in Plaintiff." (Compl. ¶ 31.)

4. "Defendant, Dr. Rickard K. Dalberg, M.D., at all times acting as the agent and/or employee of Defendant FEMA, owed Plaintiff the duty to exercise ordinary care, and to comply with the standard of care set forth in §8.01-581.20 of the Code of Virginia." (Compl. ¶ 70.)

5. "As a direct and proximate result of the acts and omissions of Defendants FEMA and Dalberg above, Plaintiff suffered, and continues to suffer, severe injury including but not limited to near fatal massive hemorrhaging requiring multiple transfusions and surgery, profound anemia, severe leg, stomach and head pain, severe psychological damages, terror, depression, anxiety, and humiliation." (Compl. ¶ 72.)

Additionally, an exhibit attached to the Complaint indicates that Dalberg prescribed antibiotics to Deavers on December 22, 2011, pursuant to Deavers's First Medical Request and the initiation of a MRSA protocol. (Compl. Ex. 1, at 2.) In reply to the Dalberg Motion, Deavers asserts that Dalberg prescribed warfarin to Deavers on December 9, 2011, citing "pharmacy records" that are not attached to any document filed with the Court. (Pl.'s Mem. Opp'n Dalberg Mot. 3.)

Dalberg does not dispute these facts, but argues that even if his knowledge of Deavers's warfarin use is established, the claims for deliberate indifference and negligence still fail. The Court disagrees with Dalberg's contention. If Dalberg prescribed warfarin to Deavers, it is reasonable to infer that he was also the physician who prescribed INR/PT tests at two-week intervals and who was responsible for reviewing both Deavers's initial INR/PT test results and her subsequent test results. These inferences are supported by the timing of events: Dalberg

initially prescribed warfarin on December 9, Deavers's blood was initially drawn on December 10, and on December 12, an unidentified physician ordered biweekly testing and a "physician's order in [Dalberg's] name confirm[ed] that he ordered Warfarin." (Pl.'s Mem. Opp'n Dalberg Mot. 3.) On these facts, Deavers has met her burden to plausibly allege that Dalberg had knowledge of Deavers's serious medical condition (for the Section 1983 claim) and to plausibly allege that Dalberg owed Deavers a continuing duty of care related to his treatment of her (for the negligence claim).

### 2.  Legal Sufficiency of, and Defenses to, the Section 1983 claim

The Court applies the same analysis to Dalberg as previously applied to the Nurse Defendants' failure to monitor Deavers's INR/PT levels, *supra* page 15. The Complaint repeatedly alleges that neither Dalberg nor any Jail employee reviewed the results of Deavers's INR/PT tests prior to January 4, 2012. This allegation is supported by the fact that the results of the INR/PT test were never communicated to Deavers despite numerous requests. Dalberg asserts that the existence of a Physician Orders sheet belies any indifference on Dalberg's part; however, the Physician Orders sheet does not make any reference to Deavers's INR/PT levels and the record contains no evidence of when, or if, Dalberg actually reviewed those test results. On these facts and drawing all reasonable inferences in favor of Deavers, the Complaint states a claim of deliberate indifference against Dalberg.[10]

Dalberg asserts an entitlement to qualified immunity. However, his argument rests on an assumption that the Complaint fails to allege a constitutional injury. In light of the foregoing analysis, Dalberg has not met his burden to show that he did not violate Deavers's constitutional rights as a matter of law. Therefore, Dalberg is not entitled to qualified immunity at this time.

---

[10] The Court notes, however, that Dalberg's decision to decrease the INR/PT testing frequency from weekly to biweekly likely cannot independently support a claim for deliberate indifference. Disagreements between an inmate and a physician regarding the course of proper medical care generally do not state a Section 1983 claim, *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)), and even conduct rising to the level of medical malpractice does not violate the Eighth Amendment where it was inadvertent, *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

//

### 3. Legal Sufficiency of, and Defenses to, the Negligence Claim

Deavers has sufficiently alleged that Dalberg owed her a duty of care and, in failing to monitor her INR/PT levels, has sufficiently alleged a breach of that duty that caused Deavers's injuries. Dalberg asserts that the Complaint insufficiently pleads causation. However, this argument is based only on the facts alleged in the Complaint and does not account for the reasonable inferences that can be drawn from those facts.

Dalberg also asserts an entitlement to sovereign immunity as an employee of the Commonwealth of Virginia. The Court finds that this case is more analogous to those decisions of the Supreme Court of Virginia to have denied defendants the protection of sovereign immunity. There are four primary cases in which the Supreme Court of Virginia has considered the issue of whether a negligent physician is entitled to sovereign immunity.

In *James v. Jane*, 282 S.E.2d 864 (Va. 1980), the Supreme Court of Virginia set out a four-part test to determine whether state employees are entitled to sovereign immunity. Courts are to consider (1) the nature of the employee's function, (2) the extent of the Commonwealth's interest and involvement in that function, (3) the degree to which the Commonwealth control's the employee's conduct, and (4) the degree to which the employee's conduct was ministerial or discretionary. *Id.* at 869. The defendants in *James* were physicians employed by the University of Virginia School of Medicine to teach medical school residents. *Id.* at 864-65. In declining to grant sovereign immunity, the Supreme Court noted that the defendants created independent relationships with their patients, *id.* at 868-69, and that the conduct at issue (providing medical care to private patients) was not related to the government's interest (providing quality medical education), *id.* at 870. Similarly, in *McClosky v. Kane*, 604 S.E.2d 59 (Va. 2004), the Supreme Court of Virginia denied sovereign immunity to a part-time, contract physician employed by a state psychiatric hospital to provide non-psychiatric medical care to patients who were referred

16

to him; the court found the Commonwealth's lack of control over the defendant to be dispositive, and did not consider the remaining *James* factors. 604 S.E.2d at 62 & n.2.

In contrast, in *Lohr v. Larson*, 431 S.E.2d 642 (Va. 1993), the Supreme Court of Virginia held that a physician employed by a state-run public health clinic was entitled to qualified immunity where the medical discretion he exercised was integral to the function of the public health clinic and the state controlled the means by which he provided care. 431 S.E.2d at 643, 646. Similarly, in *Garguilo v. Ohar*, 387 S.E.2d 787 (Va. 1990), sovereign immunity was granted to a state-employed physician who was allegedly negligent in her care of a patient who was participating in a state-funded medical research program. 387 S.E.2d at 788, 791.

Naturally, both Parties assert that this precedent supports their position. Viewing the limited facts currently on the record, the Court acknowledges that Dalberg's position and the Jail's function have elements of commonality with each of the cited cases. However, it appears that the thread of uniformity in these cases grants immunity where an actual employment relationship existed and where the employee's function related directly to the government interest.

Dalberg cannot tie himself to this thread. As in *James* and *McClosky*, Dalberg was not an employee of the state, but instead provided his services by contract and was employed by FEMA. As in *James* and *McClosky*, the government's interest in Dalberg's function was merely ancillary to its primary interest. Virginia's primary interest in the Jail is the incarceration of convicted criminals, rather than the provision of medical care. *See McClosky*, 604 S.E.2d at 690 & n.1 (distinguishing *Lohr*, 431 S.E.2d 642, on the grounds that the Commonwealth's objective was preserving the public health and, thereby, implying that a provision of non-psychiatric medical treatment was an ancillary objective in the operation of a psychiatric hospital). Applying the *James* test in light of these commonalities, the Court finds that Virginia's interest, involvement, and control over Dalberg's function as an independent contractor providing medical care to

17

inmates is too attenuated to warrant the Commonwealth's protection. Accordingly, Dalberg is not entitled to sovereign immunity.

For all these reasons, the Complaint states claims against Dalberg for deliberate indifference and negligence as a matter of law.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the RRJA Motion will be GRANTED in part, with respect to RRJA and Joseph Higgs, and DENIED in part, with respect to K. Diggins. Because Defendants do not object, Deavers is GRANTED leave to amend her Complaint only as to RRJA and Joseph Higgs. (Reply RRJA Mot. 4.) At the Plaintiff's request, the Complaint will be DISMISSED with prejudice as to Defendant S. Canzon. (Mem. Opp'n RRJA Mot. 11.) The Dalberg Motion will be DENIED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this __2nd___ day of July 2014.

18